CASE NO. 23-14049

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ESTATE OF RICHARD D. SPIZZIRRI, DECEASED,
JOHN J. MCATEE, JR., PERSONAL REPRESENTATIVE,

Petitioner/Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent/Appellee.

On Appeal from the United States Tax Court
Washington, DC
Tax Court Case No. 19124-19

**INITIAL BRIEF OF APPELLANT**

JONES FOSTER P.A.
Joanne M. O'Connor, Esquire
Florida Bar No. 0498807
Email:  joconnor@jonesfoster.com
Hanna B. Rubin, Esquire
Florida Bar No. 1031872
Email: hrubin@jonesfoster.com
505 S. Flagler Dr., Suite 1100
West Palm Beach, FL 33401
Telephone: (561) 659-3000

Attorneys for Appellant

# Case No. 23-14049

## *Estate of Richard D. Spizzirri, etc. v. Commissioner of Internal Revenue*

## CERTIFICATE OF INTERESTED PERSONS

## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Cir. R. 26.1-1, 11th Cir. R. 26.1-2, 11th Cir. R. 26.1-3, and 11th Cir. R. 26.1-4, Petitioner/Appellant hereby files his list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case.

Boisture, Pooja A. (U.S. Department of Justice counsel for Respondent)

Bowers, David E. (counsel for Petitioner)

Camp, Ray Malone. Jr. (counsel for Internal Revenue Service)

Commissioner of Internal Revenue (Respondent/Appellee)

Desmond, Michael J. (Chief Counsel, Internal Revenue Service)

Estate of Richard D. Spizzirri, Deceased (Petitioner/Appellant).

Internal Revenue Service (Respondent/Appellee)

Jones Foster P.A. (counsel and appellate counsel for Petitioner/Appellant)

Lewis Roca Rothgerber Christie LLP (counsel for Petitioner)

McAtee, John J., Jr. (Personal Representative of the Estate of Richard D. Spizzirri) (Petitioner/Appellant)

*Estate of Richard D. Spizzirri, etc. v. Commissioner of Internal Revenue*

O'Connor, Joanne M. (appellate counsel for Petitioner/Appellant)

Paul, William M. (Acting Chief Counsel, Internal Revenue Service)

Pollack, Jonathan (attorney for Decedent and Petitioner/Appellant)

Rubin, Hanna B. (appellate counsel for Petitioner/Appellant)

Smith, Bryant W. H. (Senior Counsel, Internal Revenue Service)

Sorensen, David W. (Special Trial Attorney, Internal Revenue Service)

Ugolini, Francesca (Chief, Appellate Section, Tax Division, United States Department of Justice)

Urda, Patrick J. (U.S. Tax Court Judge)

Walker, James R. (counsel for Petitioner)

Petitioner/Appellant is an individual and Respondent/Appellee is a governmental agency. There are no subsidiaries, conglomerates, affiliates, parent corporations or any publicly held corporation that owns 10% or more of any party's stock.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant, ESTATE OF RICHARD D. SPIZZIRRI, DECEASED, JOHN J.

MCATEE, JR., PERSONAL REPRESENTATIVE, does not request oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...........................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF CONTENTS.......................................................................................... ii

TABLE OF CITATIONS ........................................................................................iv

JURISDICTIONAL STATEMENT ...................................................................... vii

STATEMENT OF THE ISSUE.................................................................................1

STATEMENT OF THE CASE...................................................................................2

    A. Statement of the Facts.......................................................................................3

        1. The 1997 Prenup: Decedent Agrees to Fund a Marital Trust
           With 25% of His *Gross* Estate for Ms. Lueders' Lifetime ........................3

        2. The Third Modification: Ms. Lueders Forfeits the Marital
           Trust Funded by the Gross Estate and Decedent Promises
           Her Children $3,000,000 ...........................................................................6

        3. The Decedent's Estate Plan: Will and Four Codicils.................................8

        4. The Decedent's Relationship with Ms. Lueders and Status
           of the Estate at His Death in 2015 ...........................................................10

        5. The Resolution of Ms. Lueders' Children's Claims ...............................10

    B. The Proceedings Below. ...................................................................................11

STANDARD OF REVIEW ....................................................................................14

SUMMARY OF THE ARGUMENT ......................................................................15

ARGUMENT ..................................................................................17

        THE TAX COURT ERRED WHEN IT FOUND THE
        ESTATE'S THREE $1 MILLION PAYMENTS TO MS.
        LUEDERS' CHILDREN WERE NOT DEDUCTIBLE CLAIMS
        UNDER 26 U.S.C. § 2053. ...................................................17

    A.    The Estate Successfully Shifted the Burden to the
        Commissioner.....................................................................17

    B.    The Stepchildren's Settlement Payments Were Contracted
        Bona Fide and for Adequate and Full Consideration.........18

        1.  The Stepchildren's Claims Were Contracted Bona Fide. .............19

        2.  The Claims were Supported by Full and Adequate
            Consideration. ...............................................................24

            a.  The Tax Court Erred in Refusing to Look Outside
               Article IV for Consideration for the Claimed Payments. ........24

            b.  Ms. Lueders' Waiver of Support Rights was Full
               and Adequate Consideration: *Kosow* Controls. ......................30

            c.  Ms. Lueders Provided Full and Adequate Consideration
               at the Third Modification in 2005, When She Forfeited
               an Income Interest in 25% of the Gross Estate. ......................33

CONCLUSION...............................................................................37

CERTIFICATE OF COMPLIANCE......................................................38

CERTIFICATE OF SERVICE ...........................................................39

# TABLE OF CITATIONS

**Page**

## Cases

*Anheuser-Busch Ice & Cold Storage Co. v. Reynolds*,
    221 A.D. 174 (N.Y. App. Div. 1927) ............................................................15

*Barden & Robeson Corp. v. Timmerman*,
    116 A.D.2d 814 (N.Y. App. Div. 1986) .....................................................29

*Estate of Carli v. Comm'r of Internal Revenue*,
    84 T.C. 649 (1985) ...........................................................................31, 32, 36

*\* Estate of Kosow,*
    45 F.3d 1524 (11th Cir. 1995) ..................... 14, 15, 18, 19, 20, 21, 30, 31, 36

*Golsen v. Comm'r of Internal Revenue*,
    54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971)............................30

*Hewitt v. Comm'r of IRS*,
    21 F.4th 1336 (11th Cir. 2021) ....................................................................14

*K & D Holdings, LLC v. Equitrans, L.P.*,
    812 F.3d 333 (4th Cir. 2015) .......................................................................29

*Kass v. Kass*,
    696 N.E.2d 174 (N.Y. 1998) ..................................................................25, 26

*Pollard's Estate v. Comm'r of Internal Revenue*,
    52 T.C. 741 (1969).......................................................................................29

*Sanders v. Comm'r of Internal Revenue*,
    No. 15143-22, 2023 WL 7220014 (T.C. Nov. 2, 2023)................................29

*Schiano v. Hirsch*,
    22 A.D.3d 502 (N.Y. App. Div. 2005).........................................................26

*Strong v. Dubin*,
 75 A.D.3d 66 (N.Y. App. Div. 2010) ......................................................25, 26

*Van Kipnis v. Van Kipnis*,
 900 N.E.2d 977 (N.Y. 2008) ........................................................25

**Statutes**

26 U.S.C. § 2031 ...........................................................................33

26 U.S.C. § 2043(b) ......................................................................31

\* 26 U.S.C. § 2053 ...........................................1, 2, 17, 18, 37

26 U.S.C. § 6103(a) ......................................................................23

26 U.S.C. § 6214(a) ..................................................................... vii

26 U.S.C. § 6651(a)(1) ...................................................................2

26 U.S.C. § 7442 ......................................................................... vii

26 U.S.C. § 7482 ......................................................................... vii

26 U.S.C. § 7491(a) ......................................................................17

Colo. Rev. Stat. § 15-10-201 (2023) ...........................................21

**Treasury Regulations**

26 C.F.R. § 20.2053-1(b) ...................................................13, 19, 20, 23

**Rules**

Fed. R. App. P. 13 ........................................................................ vii

Fed. R. App. P. 32 ........................................................................38

11th Cir. R. 32-4 ......................................................................................38

Tax Court Rule § 142(a)(1)) ...................................................................17

**Other Authorities**

15 Williston on Contracts § 45:3 (4th ed. 2022) ....................................28

15 Williston on Contracts § 45:4 (4th ed. 2022) .............................28, 29

# JURISDICTIONAL STATEMENT

The Tax Court had jurisdiction over the initial dispute under Title 26, Section 6214 of the United States Code. 26 U.S.C. § 6214(a) (". . . [T]he Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency . . . notice of which has been mailed to the taxpayer . . . ."). *See also* 26 U.S.C. § 7442 ("The Tax Court and its divisions shall have such jurisdiction as is conferred on them by this title . . . ."). The Tax Court entered its decision on September 12, 2023. ROA at 2665.

Appellant filed the Notice of Appeal on December 5, 2023 (ROA at 2670–71), within ninety days of entry of the Tax Court's decision. Fed. R. App. P. 13(a)(1)(A); 26 U.S.C. § 7482. This Court has jurisdiction of this appeal pursuant to Title 26, Section 7482 of the United States Code, which states:

> The United States Courts of Appeals . . . shall have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury . . . .

26 U.S.C. § 7482(a)(1). Venue is proper in the Eleventh Circuit pursuant to Section 7482 because the petitioner in the Tax Court (now the Appellant)—the Personal Representative for the Estate of Richard D. Spizzirri—holds legal residence in Florida. 26 U.S.C. § 7482(b)(1)(A); ROA at 357 ¶¶ 2–3.

## STATEMENT OF THE ISSUE

Whether the Tax Court erred when it found that the Estate's payments of $3,000,000 to Decedent's estranged wife's children, James Young, Margo Young and Venitia Young, made in settlement of claims the stepchildren filed against the Estate and pursuant to that Antenuptial Agreement between Decedent and Holly Lueders dated March 7, 1997 and the Third Modification thereto, were not deductible as claims under 26 U.S.C. § 2053.

## STATEMENT OF THE CASE

This case arises from the Internal Revenue Service's ("IRS") issuance of a notice of deficiency ("Notice") over two years after the Estate of Richard Spizzirri ("Estate"), through its Personal Representative, filed its Form 706. ROA at 2258, 2362.[1] According to the Notice, the IRS determined the Estate was liable for a deficiency of $2,251,189 and a delinquency penalty of $450,238 under 26 U.S.C. § 6651(a)(1). ROA at 25, 27. In relevant part, the Notice showed that the purported deficiency arose out of the IRS's complete exclusion of $3,000,000 in payments (the "Claims") to the children of Mr. Spizzirri's ("Decedent") estranged wife from the category of deductible claims under 26 U.S.C. § 2053. ROA at 30.

Title 26, Section 2053 of the Internal Revenue Code ("IRC") states that "[f]or purposes of the tax imposed [on estates], the value of the taxable estate shall be determined by deducting from the value of the gross estate," among other things, amounts "for administration expenses" and "for claims against the estate." 26 U.S.C. § 2053(a)(2), (3). "The deduction allowed by this section in the case of claims against the estate . . . shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth . . . ." 26 U.S.C. § 2053(c)(1)(a). The Tax

---

[1] This Brief will cite the Record on Appeal as "ROA at __," referencing the page of the PDF document containing the entire Record.
All emphasis is added unless otherwise indicated.

Court determined that the Claims were not deductible under this section. ROA at 2574.

## A.    Statement of the Facts.

The Claims arose out of a 2005 modification that Decedent negotiated to an antenuptial agreement ("Prenup") he entered into with his fourth wife, Holly Lueders eight (8) years earlier, in 1997.

### 1.    The 1997 Prenup: Decedent Agrees to Fund a Marital Trust With 25% of His *Gross* Estate for Ms. Lueders' Lifetime.

On March 4, 1997, the Decedent and Ms. Lueders executed the Prenup in advance of their April wedding. ROA at 989–1038; ROA at 361 ¶ 27. The Decedent was 64 years old with a net worth of nearly $28 million and annual income of $720,000; the 48-year-old Ms. Lueders had a net worth of just over $1 million and no income. ROA at 363–64 ¶¶ 37–38; ROA 1036, 1038.

The Decedent and Ms. Lueders each brought children to the marriage. Decedent had four children from his first marriage and Ms. Lueders three children, James, Margo and Venetia Young. ROA at 991; ROA at 360-61 ¶¶ 22, 27.

Both parties were represented by counsel in the negotiation of the Prenup. ROA at 1966–69. Decedent and Ms. Lueders entered into and agreed to accept the provisions set forth in the entire Prenup in place of certain rights they had in the other's property and estate. The opening "Whereas" clauses of the Prenup include the following:

> **WHEREAS**, Holly has agreed to accept the provisions set forth in this Agreement in place of all rights in the property and estate of Richard, either as his wife during her lifetime, or as his widow, heir-at-law, next-of-kin, or distributee upon his death; and
>
> **WHEREAS**, Richard has agreed to accept the provisions set forth in this Agreement in place of all rights in the property and estate of Holly, either as his wife during her lifetime, or as his widow, heir-at-law, next-of-kin, or distributee upon his death;
>
> **NOW, THEREFORE**, in consideration of the foregoing, the marriage and the mutual promises hereinafter contained, Holly and Richard agree as follows:

ROA at 994. The parties agreed that the entire Prenup would be "incorporated by reference in any separation agreement made by the parties and in any decree or judgment of divorce obtained by either party . . . ." ROA at 1022.

At more than 40 pages the Prenup contained internal cross-references among the articles and sections, including regarding consideration. *See, e.g.*, ROA at 999, Art. I, ¶ 7 ("[A]s additional consideration for Holly's waiver of maintenance and equitable distribution, as provided in Article V of this agreement, shall transfer to Holly . . . ."). Ms. Lueders agreed to the following, among other things: to relinquish any claim to the appreciation of and income and proceeds from the Decedent's assets and otherwise keep separate property during the marriage (Article 1); to waive rights to develop marital property regardless of her contributions thereto (Article I); to waive her rights to receive an equitable distribution of marital or separate property on Decedent's death (Article IV); and to waive her rights to maintenance, support, and alimony (Article V, Article VI). ROA at 995–1004, 1006, 1014, 1022–23.

As partial consideration for entering into the Prenup, the Decedent agreed to make and keep a will that would give Ms. Lueders a lifetime income stream from a professionally administered trust made up of 25% of the Decedent's **gross** estate (with a minimum of $200,000 annual income, plus cost-of-living increases adjusted annually). ROA at 362–63 ¶ 35; ROA at 1007 (Art. IV, ¶ 3(a)(I)). This trust formed by the Decedent's **gross** estate would not be reduced by federal estate taxes or debt, mortgages or other liabilities due at Decedent's death. ROA at 1009–10. Any shortfalls in the income due to Ms. Lueders would be paid from trust principal. *See id.* Only at her death would the trust residuary be distributed to Decedent's children under his Will. *See id.*; ROA at 1908-10.

Also as partial consideration for entering into the Prenup, the Decedent agreed that Ms. Lueders would have the right to reside in his East Hampton house or other primary residence for five years after his death without rent or charge. ROA at 363 ¶ 36; ROA at 1010–11. Additionally, the Decedent agreed to transfer to Ms. Lueders an 1/8 interest in his Aspen property. ROA at 362 ¶ 35; ROA at 1011.

The Prenup expressly permitted Ms. Lueders and Mr. Spizzirri to give each other **additional** gifts or bequests—without waiving or affecting other provisions. Section 3(b) of Article IV provides: "[n]otwithstanding the foregoing paragraphs, nothing contained in this Article shall be deemed to constitute a waiver by either Richard or Holly of the right to accept or disclaim, in whole or in part, any bequest,

dower or gift made . . . in the Last Will and Testament of the other or during their lifetimes." ROA at 1011.

The Decedent and Ms. Lueders married on April 6, 1997, approximately a month after they executed the Prenup.

### 2. The Third Modification: Ms. Lueders Forfeits the Marital Trust Funded by the Gross Estate and Decedent Promises Her Children $3,000,000.

Following the execution of the Prenup and subsequent marriage, the Decedent and Ms. Lueders entered into five agreements that modified certain terms of the Prenup. ROA at 1039–80. Each was labeled as a Modification Agreement and ratified the Prenup, except as modified. *Id.* at 1040, 1047, 1055, 1065, 1076.

The First and Second Modifications focused on Ms. Lueders' right to reside, free of charge, in certain residences acquired by the Decedent after his death. ROA at 1010, 1040-41, 1044-47. By the Second Modification, Ms. Lueders also obtained the exclusive right to sell the Decedent's Penthouse Apartment or subsequent primary residence and use the net proceeds to purchase another home. ROA at 1045–46. Nothing in these early modifications altered the Decedent's obligation to provide Ms. Lueders with a lifetime share of trust income funded with a substantial percentage of his gross estate.

By the time of the Third Modification, in November 2005, Decedent was 72 years old. ROA at 395. Ms. Lueders was just 56 years old. ROA at 367 ¶ 50.

On November 5, 2005, again represented by independent counsel, the Decedent and Ms. Lueders negotiated a Third Modification to their Prenup ("Third Modification"). ROA at 1051–59. This seven-page modification dropped the Decedent's financial obligations—in effect from 1997—to provide Ms. Lueders with lifetime income from a trust funded with an amount equal to **25% of the Decedent's *gross* estate**. ROA at 1007, 1052. Ms. Lueders also forfeited her lifetime right to reside, free of rent or charge, in the Penthouse Apartment or other primary residence. ROA at 1044–47, 1052.

For Ms. Lueders' waivers of existing contractual rights, the Decedent contractually agreed to the following at his death:

1.    To transfer all of his right, title, and interest in the Penthouse Apartment to Ms. Lueders;

2.    To pay cash of $9,000,000, including $6,000,000 to Ms. Lueders and $3,000,000 to her children;

3.    With respect to the $6,000,000 to Ms. Lueders, an alternative equal to one-fifth of the Decedent's *net* estate ("one-fifth of my gross estate" as defined by Section 2031 of the IRC "less all deductions which may be taken therefrom, including (without limitation) the marital deduction for estate taxes which may be available under the provisions of Section

2056 of the Code") and also less the value of the Penthouse Apartment "which shall be distributed as partial satisfaction";

4.  To extend a five-year right to reside in the Easthampton home, free of rent or charge to Ms. Lueders. ROA at 1053–54.

5.  To pay $3,000,000 ($1,000,000 each) to James, Margo, and Venetia Young, the children of Ms. Lueders. ROA at 1054.

ROA at 1052-54. Ms. Lueders' children were adults at the time of the Third Modification. ROA at 1972.

Just two months after the Third Modification, the Decedent and Ms. Lueders negotiated a Fourth Modification which removed the requirement that they still be "residing together" for their mutual promises to come due. ROA at 1243, 1253. In each of the final two modifications,[2] the Decedent reaffirmed his promise to pay $1,000,000 to each of Ms. Lueders' children. ROA at 1074, 1255.

### 3. The Decedent's Estate Plan: Will and Four Codicils

The Decedent had executed his Last Will and Testament ("Will") on August 9, 1979. ROA at 361¶ 29; ROA at 416. In his Will, the Decedent expressed his intent that his residual estate be shared equally by each "child of mine." ROA at 419. As

---

[2] The Fifth Modification substituted the primary residence then owned by the parties as tenants by the entirety at East 71st Street for the Penthouse Apartment. ROA at 1073.

noted, he had four children from his first marriage. ROA at 360 ¶ 22. Those children are the named residuary beneficiaries in his Will. ROA at 361 ¶ 24.

From 2011 or 2012 through his death in 2015, the Decedent was in ill health. ROA at 1844, 1846, 1945-46. During this time, he executed four codicils to his Will, three of which provided for two of his sons, born during his estranged marriage with Ms. Lueders while they lived separately.[3] ROA at 432–35; ROA at 436–41; ROA at 442–45. The First Codicil (June 24, 2014) established a trust for his son Martin. ROA at 361, Stip. Fact ¶ 30; ROA at 432–35. A Second Codicil further clarified the provisions for his son Martin. ROA at 361, Stip. Fact ¶ 31; ROA at 436–41. By the Third Codicil (November 14, 2014), the Decedent established a trust for his son Jackson. ROA at 361, Stip. Fact ¶ 32; ROA at 442–45. The codicils exclusively determined Martin's and Jackson's entitlements to share in the Estate and expressly excluded them from the Will. ROA at 432, 437, 443.

The Decedent did not provide for Ms. Lueders' children in his Will **or** any of its Codicils, during his illness or otherwise. ROA at 432–49.

---

[3] A Fourth Codicil directed that the Decedent's estate pay off the mortgage of a condominium co-owned by the Decedent and an unrelated person. ROA at 362, Stip. Fact ¶ 33.

**4.** **The Decedent's Relationship with Ms. Lueders and Status of the Estate at His Death in 2015.**

When the Decedent died on May 12, 2015 (ROA at 357), he and Ms. Lueders had been estranged for several years. ROA at 361 ¶ 28; ROA at 1844, 2565. His out-of-wedlock son Martin was just five (5) years old. ROA at 1979.

By the time of his death, Decedent's gross estate had grown to nearly $81 million. ROA at 401-404. A former corporate attorney and active private investor, the federal estate tax return lists numerous private venture investments in the tens of millions of dollars, with corresponding margin debt of nearly $20 million to Credit Suisse and nearly $14 million in mortgages. ROA at 401, 406.

**5.** **The Resolution of Ms. Lueders' Children's Claims**

Decedent's Will and the four codicils were admitted to probate in a Colorado state court on May 21, 2015. ROA at 367, ¶ 52. That court appointed John J. McAtee, Jr., a resident of Florida, as the Personal Representative of the Estate. ROA at 357 ¶ 2; ROA 367 ¶ 53.

Several months after the Decedent's death, Ms. Lueders' children filed their Claims against the Estate in the Colorado probate proceeding, relying on the Decedent's promise to pay them in the Prenup as modified. ROA at 368 ¶ 55; ROA at 1081. Ms. Lueders' children did not assert any right to recover as beneficiaries under the Decedent's Will. Indeed, it was undisputed that they were not beneficiaries of the Estate under Colorado law. ROA at 368 ¶¶ 55–56.

In 2016, the Estate paid each of the three Stepchildren $1,000,000, in addition to penalties for late payment. ROA at 369 ¶ 63. The Estate thereafter issued and filed an IRS Form 1099-MISC Income Statements with respect to each of these $1,000,000 payments. ROA at 369–70 ¶ 64; ROA at 1978.

## B. The Proceedings Below.

At trial, the Estate presented seven (7) witnesses. First, Mr. McAtee testified regarding his work to administer the Estate. *See, e.g.*, ROA at 1845–47. He also discussed his relationship with the Decedent, which included work as corporate law partners at a prestigious New York Law firm in the 1970s and 1980s. ROA at 1841-42. Mr. McAtee described Decedent's transition to an aggressive investor who leveraged his assets to invest in early biotech company deals. ROA at 1843.

Next, Alan Langer, an advisor to the Decedent and the Estate, testified. ROA at 1929–1930. He discussed the preparation of the Estate's tax return, including the reasons for delays. *See, e.g.*, ROA at 1931–34. The third witness was Abigail Kamen, the Decedent's daughter. ROA at 115. Ms. Kamen testified about the Decedent's personal life and his death of multiple myeloma after years of illness. *See, e.g.*, ROA at 1945–46.

The Estate's fourth witness was Jonathan Pollack, an attorney with an LLM who has represented the Decedent and the Estate. ROA at 1963, 1966–67, 1973. Among other things, Mr. Pollack explained the Prenup and Modifications. ROA at

1969–73. Mr. Pollack also discussed claims filed against the Estate, including the Claims made by Ms. Lueders' children. ROA at 1974–75, 1976–78. Mr. Pollack explained that he and Mr. McAtee could identify no basis to challenge the Claims under the applicable Colorado law and, therefore, paid them. ROA at 1977-78.

The Estate presented the testimony of three experts. Justice David Saxe, a former Justice in New York's appellate division, testified that the Prenup and Modifications were enforceable under the governing New York law. ROA at 2073–74, 2083–84. Justice Saxe also testified that the equitable distribution and spousal support rights waived by Ms. Lueders may have equaled the assets that she received through the Prenup and Modifications. ROA at 2084–87. Justice Saxe's report concluded:

> Based on my knowledge of and experience in New York matrimonial law and on the materials I have reviewed, I have concluded that parties' antenuptial agreement and the modifications thereto are valid and enforceable under New York law, and that the potential value of Ms. Lueders' waivers of equitable distribution and spousal support under the antenuptial agreement may possibly equal or outweigh the combined value of (a) her right to reside in the parties' Easthampton residence for 5 years after Mr. Spizzirri's death, (b) her 12.5% share in Mr. Spizzirri's Aspen residence, (c) her right to receive certain lump sum payments in lieu of spousal support, (d) Mr. Spizzirri's giving $3,000,000 to her children upon his death and (e) her right to receive the greater of $6,000,000 plus the interest in one of Mr. Spizzirri's properties, or one fifth of Mr. Spizzirri's gross estate, upon his death.

ROA at 1713. Justice Saxe analyzed the factors under New York law contributing to these conclusions. *See, e.g.*, ROA at 1720–25.

Experts Ayhan Nazli and Craig Stephenson of Valuation Services, Inc., testified (including via their expert report) regarding the value of Ms. Lueders' "forfeited right to receive a minimum annual income payment for her lifetime upon the death of Richard Spizzirri (the 'Minimum Annual Income Right')" and her "forfeited right to have the Estate pay the annual carrying costs associated with the real estate property located at 36 East 72nd Street, Apt. PH, New York, New York . . . for her lifetime upon the death of Richard Spizzirri (the 'Carrying Costs Right')" ROA at 1689, 2011, 2024.

The Commissioner of Internal Revenue ("Commissioner") did not present any witnesses at trial. ROA at 2230. The Commissioner argued to the trial court that the Claims were not bona fide claims. ROA at 2421–42. Specifically, the Commissioner argued the Claims reflected a donative intent by the Decedent and expectation of inheritance by Ms. Lueders. ROA at 2421. The Commissioner also argued that the items given up by Ms. Lueders did not constitute full and adequate consideration for the Claims. ROA at 2433–42.

The Tax Court concluded that "the [C]laims were not contracted bona fide but were 'essentially donative in character.'" ROA at 2574 (citing Section 20.2053-1(b)(2)(i)). The Tax Court also found that the Claims "did not stem from the performance under an agreement between [the Decedent] and the various beneficiaries" and that they were instead "testamentary gifts." *Id.* (citations omitted).

Finally, the Tax Court noted that the Estate had not "provided any evidence that Ms. Lueders and her children included these amounts as income, as might belie the conclusion that the payments under Article IV were gifts." *Id.* (citations omitted). The Tax Court ignored that the Estate filed Forms 1099 reporting the payments to the Stepchildren, even though the parties stipulated to this fact, ROA at 369–70, and Mr. Pollack testified that 1099s were issued. *Id.* at 1978. The Tax Court then *sua sponte* interpreted the Prenup to reflect an intent to isolate and separate consideration such that no consideration was offered in exchange for the Claims. *Id.* at 2574-76.

## STANDARD OF REVIEW

This Court reviews the Tax Court's legal conclusions *de novo* and upholds its factual findings unless clearly erroneous. *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1341–42 (11th Cir. 2021) (citation omitted). "The determination of whether a deduction should be allowed for a claim against an estate is fact intensive and the Court must make such determinations on a case-by-case basis." *Estate of Kosow*, 45 F.3d 1524, 1531 (11th Cir. 1995) (citation omitted).

Whether the Decedent's promises to make payments to the Stepchildren were bona fide for adequate consideration presents mixed questions of law and fact. The Court should examine the Tax Court's finding that the payments were not contracted bona fide to determine whether they were clearly erroneous. The Tax Court's finding that the payments were not contracted for adequate and full consideration presents a

mixed question of law and fact. Specifically, the Tax Court's determination that the Prenup does not represent a single agreement of mutual understandings, but a divisible contract is a question of law. See *Anheuser-Busch Ice & Cold Storage Co. v. Reynolds*, 221 A.D. 174, 176 (N.Y. App. Div. 1927) ("whether the contract is indivisible or not, the terms of the contract being given, is a question of law").

## SUMMARY OF THE ARGUMENT

The three children of the Decedent's estranged, fourth wife sued his Estate after he passed in May 2015 to enforce a promise the Decedent made to pay each of them $1,000,000. After concluding that the Claims were valid under applicable Colorado law, the Estate paid the Claims, reported its payments to the IRS and the children on Forms 1099-MISC, and sought a deduction under Section 2053. The Claims arose out of promises made by Decedent in an antenuptial agreement negotiated at arms-length with his fourth wife in 1997, as modified by another negotiated modification in 2005. Binding precedent from this Court in *Estate of Kosow*, 45 F.3d 1524 (11th Cir. 1995), compels reversal of the Tax Court's decision that the Claims were not contracted for bona fide and were not supported by full and adequate consideration.

*First*, the Tax Court clearly erred in concluding the Estate failed to present credible evidence that the Claims were contracted for bona fide. The Decedent and Ms. Lueders had been estranged for several years before his death, during which

time he fathered two children with two different women outside of his marriage, as the Tax Court readily acknowledged. Just months after promising to make the payments to Ms. Lueders' then adult children in 2005, the Decedent and Ms. Lueders entered another modification of their Prenup providing for enforcement of their rights and obligations thereunder even if they were not living together. By all accounts they were living separately as early as 2005. Although the Decedent named his own four children from his first marriage as his heirs in his 1979 Will and made bequests for his two out-of-wedlock children in 2014 Codicils to his Will—executed *after* he promised to make the $3,000,000 payments to his Stepchildren, he *never* changed his estate planning documents to provide for Ms. Lueders' children. The Commissioner and the Tax Court agreed that the Stepchildren were *not* beneficiaries of the Estate. The Tax Court failed to rebut the credible evidence presented by the Estate as to the bona fide nature of the payments to Ms. Lueders' children, including by presenting any evidence that the Decedent had any intent to gift them anything.

*Second*, the Tax Court erred as a matter of law in refusing to look outside Article IV of the Prenup for consideration for the Claims and then compounded that error by finding no full and adequate consideration for the payments to Ms. Lueders' children. There is a presumption against finding contracts divisible and the Tax Court deviated from its own prior precedent and ignored the parties' mutual assent to all the promises made and rights received in the entire Prenup when it concluded

otherwise. Full and adequate, non-zero sum consideration augmenting the value of the Estate occurred when: (1) Ms. Lueders reaffirmed her waivers of support and maintenance rights in the event of divorce, which this Court found in *Kosow* to be full and adequate consideration, even for promises to pay one's own natural children; and (2) the forfeit by Ms. Lueders (who was 16 years younger than the Decedent and only 56 years old at the time of the Third Modification) of the right to a income stream from the creation of a marital trust funded by 25% of the Decedent's ***gross*** estate.

Where the Claims were contracted bona fide and supported by full and adequate consideration, the Estate was entitled to the Section 2053 deduction.

## ARGUMENT

### THE TAX COURT ERRED WHEN IT FOUND THE ESTATE'S THREE $1 MILLION PAYMENTS TO MS. LUEDERS' CHILDREN WERE NOT DEDUCTIBLE CLAIMS UNDER 26 U.S.C. § 2053.

**A.    The Estate Successfully Shifted the Burden to the Commissioner.**

As the Tax Court noted, the initial burden of proof was upon the Estate. ROA at 2567–68 (citing T.C.R. § 142(a)(1)). If, however, the Estate "introduce[d] credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer," the burden regarding that issue should have shifted back to the Commissioner. *Id.*; 26 U.S.C. § 7491(a).

The Tax Court's finding that "the Estate's evidence d[id] not rise to the level of credible evidence" and the burden thus did not shift to the Commissioner was clearly erroneous. The Estate presented credible evidence supporting a finding that the Claims were properly deducted from the taxable Estate. The burden therefore shifted to the Commissioner to rebut that conclusion. Yet, the Commissioner called no fact witnesses and presented no expert testimony at trial. The Commissioner failed to carry its burden.

**B.     The Stepchildren's Settlement Payments Were Contracted Bona Fide and for Adequate and Full Consideration.**

Section 2053 of the Internal Revenue Code states that "[f]or purposes of the tax imposed [on estates], the value of the taxable estate shall be determined ***by deducting*** from the value of the gross estate," among other things, amounts "for ***claims against the estate***." 26 U.S.C. § 2053(a)(2), (3). "The deduction allowed by this section in the case of claims against the estate . . . shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth . . . ." 26 U.S.C. § 2053(c)(1)(a). These requirements are intended "[t]o prevent an individual from depleting his estate by transforming a bequest to a natural object of his bounty into a deductible 'claim' against the estate . . . ." *Kosow*, 45 F.3d at 1530 (citation omitted). The situation the "bona fide" and "consideration" requirements were created to avoid was not presented here.

## 1. The Stepchildren's Claims Were Contracted Bona Fide.

The settlement payments made by Petitioner to Ms. Lueders' three children were bona fide in nature, not founded on a transfer essentially donative in character but founded instead in an arm's length, transaction bargained for between Decedent and Ms. Lueders. Treasury Regulation § 20.2053-1(b) states that a claim against the estate can be deductible if it is not "founded on a transfer that is essentially donative in character (a mere cloak for a gift or bequest) . . . ." 26 C.F.R. § 20.2053-1(b). Further, this Court has rejected any suggestion that a bequest—even to one's own children—can never qualify for a Section 2053 deduction. *Kosow*, 45 F.3d at 1534. Of course, the payments at issue here were not promised to any of the Decedent's children, but the children of his estranged fourth wife, Ms. Lueders.

The Tax Court cited Treasury Regulation § 20.2053-1(b)(2)(ii) as providing guidance to evaluate "whether a claim involving family members is bona fide." ROA at 2572. "Factors indicative (but not necessarily determinative) of the bona fide nature of a claim . . . involving a family member . . . may include, but are not limited to, the following":

(A) The transaction underlying the claim or expense occurs in the ordinary course of business, is negotiated at arm's length, and is free from donative intent.

(B) The nature of the claim or expense is not related to an expectation or claim of inheritance.

(C) The claim or expense originates pursuant to an agreement between the decedent and the family member . . . and the agreement is substantiated with contemporaneous evidence.

(D) Performance by the claimant is pursuant to the terms of an agreement between the decedent and the family member . . . and the agreement can be substantiated.

(E) All amounts paid in satisfaction or settlement of a claim or expense are reported by each party for Federal income and employment tax purposes, to the extent appropriate, in a manner that is consistent with the reported nature of the claim or expense.

26 C.F.R. § 20.2053-1(b)(2)(ii). Ultimately, the Tax Court gave only cursory attention to these pertinent factors. On any examination, each factor weighs in favor of finding the Claims are deductible.

*First*, the Commissioner offered no motivation for the Decedent to gift Ms. Lueders' children $3,000,000. The Decedent was estranged from Ms. Lueders at the time of his death, for years leading up to his death, and at various times throughout their marriage. ROA at 361 ¶ 28; ROA at 1844, 2565. He had fathered two children with two different women outside of his marital relationship and one of those children, his son Martin, was just five (5) years old when the Decedent passed in 2015. ROA at 1979. Just one year after the Third Modification, the parties agree that they need not even reside together for their mutual promises in the Prenup to take effect, which suggested they were by all accounts separated. ROA at 1253. Indeed, the Stepchildren had to—and did—file claims to recover the payments due them. ROA at 368. As in *Kosow*, these circumstances belie a finding of donative intent:

> [A]llowance of the requested deduction in this case does not undermine the underlying policy behind § 2053, which is to allow an estate to deduct from its gross income legitimate claims that it is required to pay and would not likely be inclined to pay, absent a binding agreement, but to disallow claims based on agreements that are nothing more than disguised bequests. In this case, it is clear that the Estate's payment of monies to [the recipients] was triggered solely by the existence of a binding agreement and not by any donative intent on the part of the Estate. Indeed, [the recipients] had to sue the estate before it would pay them anything.

45. F.3d at 1534.

*Second*, the record is devoid of evidence that the Stepchildren ever expected to inherit from the Decedent. They were already adults when the Decedent promised to pay each of them $1,000,000 in the Third Modification. ROA at 1972. ROA The Stepchildren were Ms. Lueders' children, related to the Decedent only through marriage—not the "natural object[s] of his bounty." ROA at 361 ¶ 27; *Kosow*, 45 F.3d at 1530. *See also* Colo. Rev. Stat. § 15-10-201 (2023) (defining "child" for probate purposes as excluding a stepchild). By his 1979 Will and codicils thereto, Decedent had provided for any "child of mine," *i.e.*, his four children from his first marriage, and for his two out-of-wedlock children born during his marriage to Ms. Lueders. Yet during the 10 years between the Third Modification and his death, the Decedent ***never*** amended or supplemented his estate planning documents to provide for Ms. Lueders' children. ROA at 361, 432–49. As the parties stipulated, "[t]he Step-Children were not beneficiaries of the Estate under Colorado law." ROA at 368

¶ 56. Nor did they assert any right to recover as beneficiaries under Decedent's Will. *See id.* ¶ 55.

The Tax Court's singular focus on language that the Article IV provisions were "in lieu of any other rights which may be available to [Ms. Lueders] as [Mr. Spizzirri's] surviving spouse" and the requirement that the Decedent "make and keep in effect a will," ROA at 2574, is misplaced. That same article goes on to state that nothing therein "shall … constitute a waiver by … [Ms. Lueders] of the right to accept or disclaim, in whole or in part, any bequest, dower, or gift made to . her … during their lifetimes." ROA at 1010–11. Ms. Lueders thus expressly retained the right to receive additional bequests or gifts from the Decedent; the Prenup and Third Modification in no way condition Decedent's promises to make the Stepchildren's payments on any waiver of bequests by Ms. Lueders.

*Third and Fourth*, the Claims plainly resulted pursuant to and due to performance of agreements negotiated at arm's length by the Decedent and Ms. Lueders, the latter represented by independent counsel and bargaining on behalf of her three children. At the time of the Third Modification, as discussed in greater detail below, the Decedent had significant motive to contract to make the payments to Ms. Lueders' children in order to get out from under the marital trust to which his assets were subject.

*Finally*, the Estate reported the amounts paid in satisfaction of the Claims in a manner consistent with their characterization as deductible claims when the Estate issued and filed Forms 1099-MISC. Treas. Reg. § 20.2053-1(b)(2)(ii)(e). The Estate thus classified the payments for Federal income tax purposes consistent with their reported nature. This factor weighs in favor of finding the payments bona fide, particularly where the Commissioner presented no evidence that the Stepchildren treated the payments differently than the Estate.

Indeed, the Tax Court's finding that the Estate had not "provided any evidence that Ms. Lueders and her children included these amounts as income, as might belie the conclusion that the payments under Article IV were gifts," ROA at 2574, ignores the fact that the Estate would not have access to the confidential tax return information of third parties. 26 U.S.C. § 6103(a). The Tax Court seemed to suggest that the Estate could have prevailed only if the Estate came forward with evidence unavailable to anyone but the Commissioner, who made the deliberate decision not to present that evidence at trial. This is improper.

The Estate more than satisfied its burden to establish, by credible evidence, that the Stepchildren's claims were contracted bona fide. The Tax Court's finding that the burden never shifted to the Commissioner was clearly erroneous—it did, and the Commissioner failed to rebut the Estate's evidence.

## 2. The Claims were Supported by Full and Adequate Consideration.

The Tax Court also clearly erred in finding that the Claims were not supported by full and adequate consideration. Among the valuable rights Ms. Lueders ceded to the Decedent in consideration of their mutual promises in the Prenup, which she affirmed and ratified by the Third Modification, were her maintenance and support rights in the event of dissolution (Articles V and VI). Further, in exchange for the Decedent's promises to make the payments to her adult children by the Third Modification, Ms. Lueders gave up her bargained-for and extremely valuable right to receive trust income—for life—based on 25% of the Decedent's *gross* estate. The value of the Estate was clearly augmented when it freed itself from this significant burden in exchange for $6,000,000 and a primary residence to Ms. Lueders and a separate $3,000,000 promised payment to the Stepchildren. The Claims were supported by full and adequate consideration in the Prenup, as modified by the Third Modification.

### a. The Tax Court Erred in Refusing to Look Outside Article IV for Consideration for the Claimed Payments.

The Tax Court improperly elevated form over substance when it refused to consider any consideration for the Decedent's promised payments to the Stepchildren outside of that specifically referenced in Article IV. ROA at 2574. The Tax Court ignored Ms. Lueders' waiver of her marital property rights in Article I, waiver of spousal support and maintenance rights in Articles V and VI, or the

valuable rights she gave up for the Decedent's benefit when entering the Third Modification. In so doing, the Tax Court declined to follow governing New York law and its own prior precedent, relied on inapplicable law governing divisible (installment) contracts, and ignored the parties' expressed intentions to reach a single understanding with respect to "the mutual promises hereinafter contained" in their Prenup.

The Tax Court began with the correct premise—that prenuptial agreements governed by New York law, like the one here (ROA at 1028, Art. X ¶ 4), "are governed by traditional rules of contract interpretation." ROA at 2574 (quoting *Van Kipnis v. Van Kipnis*, 900 N.E.2d 977, 980 (N.Y. 2008)). It then deviated from that same New York contract law when it isolated Article IV from the rights and obligations that formed the parties' entire agreement. *See Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) ("[C]ourts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed."). As with contracts generally, New York directs courts as follows with respect to prenuptial agreements:

> … when interpreting a prenuptial agreement the court should arrive at a construction that will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a

whole and the intention of the parties as manifested thereby.

*Strong v. Dubin,* 75 A.D.3d 66, 68-69 (N.Y. App. 2010) (quoting *Kass,* 696 N.E.2d 174, 180-81; *Schiano v. Hirsch*, 22 A.D.3d 502, 502 (N.Y. App. Div. 2005)) (cleaned up). "Form should not prevail over substance." *Kass*, 696 N.E.2d at 181.

A careful review of the entire Prenup confirms the mutual intentions and agreement of Decedent and Ms. Lueders to fix their respective property and other rights in the event of death or divorce—in exchange for ***all*** the promises made therein. That singular intent appears on the very first page of the Prenup:

> **WHEREAS**, Holly and Richard in anticipation of such marriage, desire to enter into this premarital agreement to fix and determine each of their respective rights in and to certain property individually owned by each of the parties at the time of their marriage and expectancies to be thereafter acquired by them and to fix and determine certain rights and claims that will accrue to each of them in the estate and property of the other by reason of the marriage; and

> **WHEREAS,** although Holly and Richard hope and intend to remain married, they have agreed to fix their rights and obligations to their property and to the support of one another in the event of their separation or the legal termination of the marriage, and to fix their rights and obligations in their property upon death…

ROA at 991. The Prenup then groups the parties' mutual promises and waivers of rights and grants of consideration together as a single expression of their mutual assent. ROA at 993-94. Ms. Lueders acknowledged that she had agreed to waive her rights to income and appreciation of the Decedent's separate assets during the marriage, to waive her rights to develop marital property regardless of her

contributions thereto, and "*to accept the provisions set forth in this Agreement* in place of all rights in the property and estate of [the Decedent], either as his wife during her lifetime, or as his widow, heir-at-law, next-of-kin, or distribute upon his death." *See id.* The Decedent made mutual promises to this same effect. *See id.* The parties did *not* agree to "[]allocate the consideration that they specified for the relinquishment of certain rights," as the Tax Court concluded. ROA at 2575. Instead, and only "*in consideration of the[ir] mutual recitals, the marriage and the mutual promises hereinafter contained, [did] Holly and Richard agree*" to *all* the provisions of the Prenup. ROA at 994.

Those operative provisions further confirm the parties' mutual assent to a single undertaking—to fix their property rights and obligations at the time of their marriage. The 40+-page agreement internally cross-references the articles and sections, including with respect to the consideration that would be provided for waiver of certain rights. For instance, the Decedent agreed to give Ms. Lueders a 12.5% interest in his Aspen property as additional consideration for her waiver of maintenance and equitable distribution as provided in Article V and each agreed by Article I to maintain their respective shares in that property as separate, not marital, property regardless of appreciation and income thereon. ROA at 999 (Article I), 1017-18 (Article V). The agreement also states that all its terms and provisions, not solely sections V and VI (titled "PROPERTY RIGHTS IN THE EVENT OF A

DISSOLUTION OF THE MARRIAGE" and "MAINTENANCE"), were to be incorporated into any separation agreement or divorce decree or judgment. ROA at 1022. Here, again, the plain text of the Prenup weighs against viewing the articles as independent of each other.

The Tax Court's reasoning that Ms. Lueders received certain promises in Article IV "in exchange for inheritance rights" ignores her prior expressed intent "to accept [all] the provisions set forth in this Agreement," "the marriage[,] and the mutual promises" each made to the other, in exchange for all the various valuable property rights she waived therein to the Decedent's benefit. ROA at 994, 1007. The Commissioner presented no evidence that the Decedent would have entered into the Prenup and made all the promises he did including, but not limited to, the payments to the Stepchildren, without *all* the consideration given him by Ms. Lueders. In other words, there is no evidence that Ms. Lueders waived her marital inheritance rights only in exchange for the property rights identified in Article IV or that the Decedent did not promise the property he did in Article IV in exchange for her waivers of rights to marital property in Article I and to spousal support, equitable distribution, and maintenance in Articles V and VI.

The Tax Court's reliance on a treatise analyzing divisible and installment contracts to deviate from its own prior precedent was misplaced. ROA at 2575 (citing 15 Williston on Contracts (Williston) § 45:3 (4th ed. 2022)). As Williston

observes "[t]here is a ***presumption against*** finding a contract divisible unless divisibility is expressly stated in the contract itself, or the intent of the parties to treat the contract as divisible is otherwise clearly manifested." Williston § 45:4 (citing *K & D Holdings, LLC v. Equitrans, L.P.*, 812 F.3d 333 (4th Cir. 2015) (additional citations omitted). This Tax Court appears to be the first to find divisible a prenuptial agreement aimed at fixing the parties' respective property rights at the point of marriage. It deviated from its own prior precedent to do so. *See Pollard's Estate v. Comm'r of Internal Revenue*, 52 T.C. 741, 745 (1969)[4] (construing the prenuptial agreement as a "reciprocal arrangement for the benefit of the natural object of each promisor's bounty") (cleaned up).

The promises made by the Decedent and Ms. Lueders were plainly conditioned on the other's performance of the entire Prenup. "Where the parties contemplate fulfillment of the entire contract, the contract is treated as indivisible." *Barden & Robeson Corp. v. Timmerman*, 116 A.D.2d 814, 816 (N.Y. App. Div. 1986).

---

[4] *Sanders v. Comm'r of Internal Revenue*, No. 15143-22, 2023 WL 7220014, *4 (T.C. Nov. 2, 2023) ("The Tax Court does adhere to the doctrine of stare decisis and thus affords precedential weight to its prior reviewed and division opinions.") (citation omitted).

### b. Ms. Lueders' Waiver of Support Rights was Full and Adequate Consideration: *Kosow* Controls.

The Tax Court's failure to follow binding precedent from this Court in *Estate of Kosow*, 45 F.3d 1524, 1531 (11th Cir. 1995), resulted in its erroneous conclusion that the Estate did not receive full and adequate consideration for the Claims through the Prenup and Third Modification. *See Golsen v. Comm'r of Internal Revenue*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971) (holding tax court is bound by precedent of U.S. Court of Appeals for the circuit to which its cases are appealable).

In *Kosow*, this Court made clear that the "waiver of support rights may constitute full and adequate consideration under § 2053," even when that waiver is exchanged for promises to pay one's own natural children. 45 F.3d at 1531. Addressing the deductibility of contractual claims against an estate, this Court stated:

> If the claim is not simply a subterfuge for a nondeductible legacy, if the claim is supported by adequate and full consideration, and if the consideration is a non-zero sum which augmented the decedent's estate, then it would seem that the deduction should be allowed, even for an agreement to make payments to the apparent natural object of one's bounty.

45 F.3d at 1531 (internal quotations omitted). This Court reasoned that "a decision to receive lesser support payments in return for a promise by one's spouse to provide for a child in his will can free a custodial parent from having to set aside part of her income to provide for the child in the event of her former spouse's death." *Id. Kosow*

controls the outcome here, which did not even involve payments to the Decedent's own children but to the children of his estranged wife.

The Tax Court wrongly concluded that the *Kosow* holding did not apply merely because, unlike in this case, the Decedent and his wife divorced. *See* ROA at 2576 n. 8 (citation omitted). This purported distinction does not hold water when the facts of *Kosow* are examined. The settlement agreement the *Kosow* Court considered was drafted in 1951, the year **prior to** the parties' divorce, such that the Decedent's spouse's rights to support were still "prospective" when she partially ceded them in exchange for the Decedent's "agree[ment] to provide a college education for the children and to leave two-thirds of his estate in a trust for the benefit of his two sons and any children from any subsequent marriage." 45 F.3d at 1527. This 1951 agreement was incorporated into the 1952 divorce decree. *Id.* When the Decedent's sons, who were ultimately excluded from the Decedent's will, made claims against the Estate, those claims "alleged that the[ Decedent] had breached [a] portion of the 1951 Settlement" that was signed **before the divorce**. *Id.* at 1527–28.

Further, divorce is not a necessary precondition for a Section 2053 deduction. In *Estate of Carli v. Comm'r of Internal Revenue*, the Tax Court held that to avoid the consideration being excluded by Section 2043(b), the marital right relinquished must have been enforceable during the life of the spouse who benefited by the release or waiver, not at the time of the agreement. 84 T.C. 649, 659-60 (1985). The court

thus rejected the argument that the wife had no support rights to relinquish because "the entire agreement was executory and conditioned upon the parties' subsequent marriage." 84 T.C. at 659. Similarly, here, Ms. Lueders gave up rights to support that would have been enforceable during the life of the Decedent who benefited by her waiver of those rights.

Finally, Justice Saxe testified to the adequacy of the consideration for Ms. Lueders' waiver of equitable distribution and spousal support. He opined that Ms. Lueders would have been entitled to significant spousal maintenance absent her waiver of that entitlement in the Prenup. The Decedent and Ms. Lueders had been married for 8 years at the time of the Third Modification in 2005 and 18 years when he died in 2015. Justice Saxe opined that "if the marriage had been dissolved after a sufficiently long duration, a New York Matrimonial Court would have awarded a low-to-mid five figure amount of Spousal Support per month to Ms. Lueders, for a period of time commensurate with the duration of the marriage." His compelling expert testimony was unrefuted by the Commissioner. The record clearly established that Ms. Lueders' waiver of spousal maintenance, support and distribution rights augmented the value of the Estate.

### c. Ms. Lueders Provided Full and Adequate Consideration at the Third Modification in 2005, When She Forfeited an Income Interest in 25% of the Gross Estate.

Additional full and adequate, non-zero sum consideration for the Claims is found in the value by which the Estate was augmented at the Third Modification.

The Decedent's Estate faced a real predicament at the time of the Third Modification, which the Tax Court ignored. The Prenup bound the Decedent to place put the bulk of his remaining estate in a trust for the remaining life of his then 56-year old (and 15-year-younger) wife before his own heirs and four children of his first marriage would ever inherit that trust corpus that had to be set aside. The Prenup required Decedent to establish a marital trust for Ms. Lueders of twenty-five (25%) percent of his **gross** estate. *See* ROA at 811. A decedent's gross estate is all property, real or personal, tangible or intangible, wherever situated. 26 U.S.C. § 2031. The Prenup expressly **disallowed** any deduction from the amount the Decedent was required to place in trust for Ms. Lueders for debts of the Estate or federal taxes due.

The marital trust provided for by the Prenup, before modification, would have required the Estate to remain open and tied up 25% of the Decedent's gross estate for Ms. Lueders' lifetime—some 30 years. At the time of the Third Modification, Ms. Lueders was 56 years old. The Decedent and his Estate would have to set aside 25% of the gross estate **for some 25-30 years,** if not longer. ROA at 131. Only then,

after Ms. Lueders passing, would those funds be unrestricted such that they could finally pass to the Decedent's own four (4) adult children.

The arms-length negotiations of the Third Modification resulted in the elimination of the obligation to create a trust that would pay Ms. Lueders a lifetime income stream based on the Decedent's ***gross*** estate and the associated severe restrictions on the Decedent's ability to leverage his own assets during his life. The Decedent was able to substitute the greater of ***fixed*** payments of $6 million and ownership of the Penthouse Apartment or 20% of the ***net*** estate[5] (the latter ultimately deemed not to apply) for the marital trust funded by his ***gross*** estate. At the same time, by and through her counsel, Ms. Lueders was able to extract from the Decedent a promise to pay $3,000,000 to her three children.

Ms. Lueders gave the Estate full and adequate consideration for its promise to pay her three children in at least two principal ways.

*First*, in exchange for the $3 million payments to the Stepchildren of his estranged wife, the Decedent freed 25% of his gross estate from a marital trust that would have tied those assets up for more than 30 years before they would revert to his heirs under the Will. The marital trust obligation left the Decedent severely restricted in the manner in which he could use his assets during his life. An

---

[5] At death, the one-fifth alternative became irrelevant based on the value of the reported net estate. ROA at 2306.

experienced, active, and successful investor, Decedent leveraged his financial and real estate assets to make investments that would grow his Estate. ROA at 401, 406, 1229, 1843, 1846-47. Yet his contractual obligation to Ms. Lueders prior to the Third Modification required him to ensure his ability to fund—at his death, whenever that might occur—a marital trust comprised of 25% of all his assets, without any deductions for that debt he used to make successful venture capital investments let alone the marital deduction for federal estate taxes his Estate would have to pay.

Placing in trust 25% of Decedent's $81,759,871 gross estate at death, for example, would have required the Estate to set aside $20,439,952 for Ms. Lueders, regardless of what the Estate might owe other lenders, creditors, and even the IRS for estate taxes due, and to do so for Ms. Lueders' lifetime. The Decedent would have to take great pains throughout his life to ensure that his debts and potential tax liabilities never even closely approximated 75% of his gross estate. If they did, the Estate would be upside down and at clear risk of bankruptcy. Decedent's duties to disclose the marital trust obligation to potential lenders would have indisputably chilled Decedent in the ability to use his own assets as collateral to further his investment business. Freeing the Estate of this marital trust funded by a significant portion of Decedent's gross estate gave Decedent the freedom to direct the use of his assets, including to leverage those assets as he saw fit, and provided an obvious non-zero sum value to the Estate.

*Second*, the arms-length exchange of the marital trust funded by 25% of the gross estate for $6,000,000 and a house to Ms. Lueders and a separate promise to pay her children $3,000,000 also ensured that his own heirs—his four children from his first marriage—would have access to that significant portion of his gross estate immediately upon his death. A marital trust created for the estranged wife's benefit with 25% of the gross estate assets would not need to remain open over the decades of Ms. Lueders' anticipated remaining life. Ensuring that Decedent's residual heirs and own children would receive their legacies, even if it meant agreeing to pay Ms. Lueders' children $3,000,000 provided an immediate value to the Estate.

Applying *Kosow*, the Third Modification is clearly supported by full and adequate consideration. The Claims were not subterfuge for a nondeductible legacy by Decedent; they were claims brought by adult children of an estranged spouse who had to sue the Estate for payment. The Tax Court "has not interpreted the 'adequate and full' consideration requirement as necessitating a precise dollar-for-dollar matching of consideration paid with the value of the transferred property." *Carli*, 84 T.C. at 661 (citation omitted). Here, Decedent negotiated adequate and full consideration that was a non-zero sum when he freed the Estate from a trust that tied up assets amounting to 25% of the gross estate, allowing him to control and leverage those assets as he saw fit and ensuring the inheritance rights of his own four children

at his death. This value the Estate received in exchange for a negotiated promise to pay $3,000,000 to the Stepchildren supports a Section 2053 deduction.

## CONCLUSION

For the foregoing reasons, the United States Tax Court erred in determining that the Claims were not deductible from the taxable Estate. Petitioner presented credible evidence that Claims were contracted for bona fide and for full and adequate consideration, and the Commissioner failed to carry its shifted burden to rebut that evidence. The Estate therefore respectfully requests that this Court reverse the Tax Court's ruling to the extent it denied deductions for the Claims.

Respectfully submitted,

JONES FOSTER P.A.
Joanne M. O'Connor, Esquire
Florida Bar No. 0498807
Email:  joconnor@jonesfoster.com
Hanna B. Rubin, Esquire
Florida Bar No. 1031872
Email: hrubin@jonesfoster.com
505 S. Flagler Dr., Suite 1100
West Palm Beach, FL  33401
Telephone:  (561) 659-3000
*Attorneys for Appellant*

By:  /s/ Joanne M. O'Connor
       Joanne M. O'Connor, Esq.

# CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitations set forth in FRAP 32(a)(7)(B) because this brief contains 8,942 words, excluding the parts of the brief exempted by FRAP 32(f) and 11th Cir. R. 32-4.

I further certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

By: /s/ Joanne M. O'Connor
Joanne M. O'Connor, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Filing.

By: /s/ Joanne M. O'Connor
       Joanne M. O'Connor, Esq.

# SERVICE LIST

Ray Malone Camp
Internal Revenue Service
600 17th St., Suite 300N
Denver, CO  80202
Ray.malone.camp@irscounsel.treas.gov

Bryant W. H. Smith
Senior Counsel
Internal Revenue Service
178 S. Rio Grande St.
Suite 250 A, M/S 2000
Salt Lake City, UT  84101
Bryant.w.smith@irscounsel.treas.gov

David W. Sorensen
Internal Revenue Service
300 Pearl St., Suite 460
Buffalo, NY  14202
David.w.sorensen@irscounsel.treas.gov

Francesca Ugolini, Chief
U.S. Dept. of Justice
P.O. Box 502
Tax Division, Appellate Division
Washington, DC  20044

Pooja A. Boisture
U.S. Dept. of Justice
P.O. Box 502
Tax Division, Appellate Section
Washington, DC 20044
Pooja.a.boisture@usdoj.gov

#3669263 v1 32749-00001